IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff | REPORT AND RECOMMENDATION |
| v. | 09-cr-04-bbc |
| RONNIE NEWMAN, | |
| Defendant. | |

_____

REPORT

The grand jury has charged defendant Ronnie Newman with being a felon in possession of a firearm. Beloit police seized the firearm during a search of Newman's girlfriend's apartment undertaken pursuant to consent provided by the girlfriend. Before the court is Newman's motion to suppress the firearm and other evidence seized during the search, as well as his post-arrest confession derived from the search. Newman contends that the police coerced his girlfriend, Raven Diaz, to consent to the search. *See* Dkt. 16. The government responds that there was no coercion and argues inevitable discovery as a safety net. The government is correct and I am recommending that the court deny Newman's motion.

On March 9, 2009, this court held an evidentiary hearing. Having heard and seen the witnesses, having judged their credibility and having reviewed the relevant documents, I find the following facts:

**Facts**

Ronnie Newman and Raven Diaz have been romantically involved since at least 2007. They have an infant son together. In 2008, Diaz was 28 years old, had a degree from technical college and was working full-time. Newman looked after their son, while Diaz commuted to her

job in Rockford. At some point Newman moved in with Diaz at her residence at 407 Bluff Street, Apartment 3, Beloit, Wisconsin, although later he might have moved out.[1] Regardless, in the summer of 2008 there was only one key to Apartment 3 and Newman had it.

During the summer of 2008, Beloit police developed information that a man living at 407 Bluff Street was selling illegal drugs from that location. Two confidential informants provided this information. One of them had performed a controlled purchase of illegal drugs from this person sometime between June 30 and July 3, 2008.[2] The informants described the drug seller as an African American man, about 5 foot 6 inches tall, stocky build, with a tuft of reddish hair on his chin, who drove a blue moped.

At about 6:00 p.m. on Thursday, July 3, 2008, Beloit Police Sergeant Danny Tilley drove past 407 Bluff Street and saw a blue moped in the front yard. Someone ran the plates and learned that the moped was reported stolen. Sergeant Tilley and other officers, including Thomas Halvorsen, decided to conduct surveillance in an attempt to intercept their drug suspect when he got on the blue moped. At about 6:00 p.m. Sergeant Tilley saw an African American man exit 407 Bluff Street and walk toward the corner of Bluff and Vernon. Sergeant Tilley exited his unmarked vehicle, approached the man and asked him to stop. The man fled. Sergeant Tilley drove around the block, but lost him.

---

[1] In her pre-hearing affidavit, Diaz averred that Newman had lived with her "for approximately the preceding seven months" before Newman's arrest on July 3, 2008. *See* dkt. 16, Exh. 2. This implies that Newman still lived at the apartment on July 3, 2008. But at the evidentiary hearing, Diaz testified that Newman had moved in with her in July 2007 and had moved out in May 2008. *See* transcript, dkt. 20, at 69-70.

[2] The police obviously knew the actual date but they provided a 72-hour time span in their report.

Sergeant Tilley drove back to Bluff Street where he observed a different African American man on the blue moped that was listed as stolen. This man matched the description of the person believed to be selling drugs from 407 Bluff Street. Sergeant Tilley arrested him for riding the moped without the owner's permission. The man on the blue moped was Ronnie Newman.

Officers transported Newman downtown and booked him on a joyriding charge. Sergeant Tilley contacted one of his drug informants and showed the informant a photo of Newman. The informant identified Newman as the person who had sold the informant drugs within the past three days. Based on the information collected up to that time, Sergeant Tilley began drafting a search warrant application for 407 Bluff Street, Apartment 3.[3] Sergeant Tilley directed Officer Halvorsen to watch the premises until the warrant was obtained in order to preserve the integrity of the apartment until it could be searched. Halvorsen checked with other tenants at 407 Bluff Street to obtain a description of Diaz, presumably so that he would recognize her if she returned to the residence. He then waited in his squad car in front of the house. Officer Patrick Mackie also was on the scene in his own squad car.

At about 8:00 p.m. that same evening, Raven Diaz returned from work, having received a ride from her friend, Alicia Berger. Prior to arriving home, Diaz had received a telephone call from Newman at the jail. He reported his arrest for driving a stolen moped and asked Diaz to find the bill of sale. As Diaz got out of Berger's car, Officer Halvorsen approached and asked both women to provide identification. When the women asked what was happening, Officer Halvorsen responded that the women had driven up on an investigation involving 407 Bluff

---

[3] The police reports indicate that Sergeant Tilley had checked the mailboxes at 407 Bluff and saw that Apartment 3 was in the name of Diaz and Newman. It is not clear exactly when he did this.

Street. Both women provided drivers licenses for identification. At some point, Officer Mackie joined the trio and everyone moved to the front porch of the residence.

Officer Halvorsen asked Diaz who lived in Apartment 3. She responded that she and her baby were the only residents, and that Newman's name was on the mailbox because he would be getting mail there in the future. Eventually Diaz expanded on this, claiming that Newman provided child care for their son while Diaz worked, and that he often spent the night. At some point Diaz admitted that there was only one set of keys into Apartment 3 and that Newman had them. Diaz advised the officers that she had talked to Newman, was aware that he was under arrest because of the moped, and she didn't understand how that could be. Officer Halvorsen responded that the moped was listed as stolen, then advised Diaz that Sergeant Tilley was in the process of writing a search warrant application for Apartment 3. Officer Halvorsen told Diaz that the whole process would go more quickly if she would consent to the search. Diaz expressed puzzlement as to why the police would want to search the apartment based on the moped charge.

Diaz also might have expressed concern about a dog upstairs that needed to be let out.[4] Regardless, Officer Halvorsen explained that if Diaz consented, then the police could begin searching right away, which would be significantly quicker than waiting for a search warrant to issue. Diaz did not immediately agree to the requested search. She explained that she smoked marijuana and that there was a smoking device upstairs. Officer Halvorsen responded that it was possible that this could be handled with a citation rather than a criminal charge.

---

[4] At the evidentiary hearing, Officer Halvorsen and Alicia Berger recalled Diaz's concern for her dog but Diaz did not mention the dog as one of her reasons for being anxious to get into the apartment.

It is likely that the police also told Diaz that if they had to get a warrant and then found contraband beyond the marijuana in her apartment, then Diaz could face criminal charges for it and face the consequences. On the other hand, if Diaz consented to a search, then the police would agree up front to limit her exposure to the marijuana to which she had admitted.[5] Because Diaz did not know what other people–namely Newman and his friends–might be doing or keeping in her apartment while she was at work, she was worried that if the police found contraband of which she was unaware, it would be attributed to her. In Diaz's estimation, the best way to protect herself from possible criminal exposure for other people's stuff was to consent to the search.

Diaz consented to a police search of her apartment. Officer Halvorsen contacted Sergeant Tilley to advise him of this. Officer Halvorsen asked Sergeant Tilley to drive back to the scene with a written consent form for Diaz to sign. Because the police station was so close, Sgt. Tilley arrived within a few minutes.

Sergeant Tilley presented Diaz with a pre-printed consent form which stated:

> I, Raven M. Diaz, having been informed of my constitutional rights not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize _Officer Halvorsen_ and _Sergeant Tilley_, Beloit police officers, who has identified themselves as Beloit police officers, to conduct a complete search of my premises. . . . This written permission is being given by me to the above-named officers voluntarily and without threats or promises of any kind.

Dkt. 19, Exh. 2.

---

[5] The four witnesses split 2-2 along party lines on whether the police made these representations. Although the record is far from clear on this point, I am willing to give Newman the benefit of the doubt.

5

Diaz signed this form. The total elapsed time from when the officers first approached Diaz in her car until she signed the form was approximately ten minutes. During these ten minutes, the officers did not shout at Diaz, did not handcuff her and did not touch her. They did not allow her to enter the apartment but they did allow her to smoke cigarettes during their interaction on the front porch. Upon obtaining consent from Diaz, the officers entered the apartment with Diaz and searched it with her assistance. They recovered drug paraphernalia and the handgun charged against Newman in this federal prosecution.

ANALYSIS

Newman contends that the police coerced Diaz into consenting to search the apartment. The government bears the burden of proving that Diaz consented voluntarily. A determination of voluntariness is based on the totality of circumstances, including Diaz's age, education, and intelligence, whether she was advised of her constitutional rights; whether and how long she was detained before giving consent; whether consent was immediate or prompted by repeated requests, and whether there was any physical or psychological coercion. *United States v. Hicks*, 539 F.3d 566, 570 (7th Cir. 2008) An initial refusal to consent does not automatically render a search invalid. *Id.*

Newman does not dispute that Diaz was of sufficient age, education and intelligence to be capable of providing valid consent to search. Diaz was an articulate and assertive witness at the evidentiary hearing, holding her own during cross-examination. Newman does not dispute that the waiver form that Diaz signed advised her that she had the right to refuse to consent and to insist upon a warrant.

Rather, Newman contends that the police overbore Diaz's free will because she was constructively detained, the police hectored her to consent despite repeated refusals, they improperly claimed that they could–and would–get a search warrant if she made them, and they threatened that if Diaz forced a search warrant, then the police would pin all of the contraband on her, while if she consented, they would not. The government disputes each of these points and closes by invoking the inevitable discovery doctrine, asserting that Diaz's admission that there was marijuana and paraphernalia in the apartment was enough by itself to provide probable cause to support a search warrant. Newman replies that because these admissions were contemporaneous with Diaz's coerced consent, they were involuntary.

Let's invoke Occam's Razor and start with Diaz's admissions about her marijuana. Diaz does not dispute that she told the officers that she smoked marijuana and they would find illegal drug paraphernalia in her apartment. Diaz does not argue that these admissions were insufficient to support a search warrant. Therefore, absent taint, Diaz's admissions would be sufficient to have triggered a chain of events that would have led to a warrant independent of the consent search that Diaz now challenges. In that case, the deterrence rationale of the exclusionary rule no longer would apply. *See United States v. Johnson*, 495 F.3d 536, 542-43 (7th Cir. 2007).

Newman goes with taint, claiming in his reply brief that the police did not know about Diaz's marijuana until after she (involuntarily) signed the consent form. Newman implies that the timing establishes that Diaz's admissions were fruit of the poisoned tree. *See* dkt. 25 at 7. I'm not sure that this is an analytically sound implication, but I need not explore it because Newman's factual predicate is incorrect. At the evidentiary hearing Newman posited that the police knew about Diaz's marijuana *before* she signed the form. *See* transcript, dkt. 20, at 29-30.

7

More importantly, this is what Diaz repeatedly claimed in her testimony. *Id.* at 43-45, 57-60. At no time did Diaz state or imply that she felt compelled to tell the police that she had marijuana in the apartment. She *offered* this information as one reason she was hesitant to consent to a search. In short, this was a voluntary statement. Therefore, the inevitable discovery doctrine applies and Newman is not entitled to suppression of any evidence.

For completeness's sake, I will address Newman's other arguments, namely that the police overbore her will by making a baseless threat to obtain a warrant, making a baseless threat to arrest her if they had to get a warrant and found contraband in her apartment, and generally wore down her resistance by their relentless hectoring.

As for the first argument, "baseless threats to obtain a search warrant may render consent to search involuntary, [but] when the expressed intention to obtain a warrant is genuine and not merely a pretext to induce submission, it does not vitiate consent to search." *Hicks,* 539 F.3d at 571. Intent to obtain a warrant is genuine if the police have probable cause or a reasonable factual basis to believe there was probable cause to support a warrant. To avoid a potential cat's paw by police, the court must determine if there was a reasonable factual basis upon which to conclude there was probable cause. *Id*. at 572.[6] Newman seems to think that the rule against cat's paws required Officer Halvorsen personally to know what evidence Sgt. Tilley was going to use to support his warrant application. Not so: the court's job simply is to review the information that Sgt. Tilley intended to put into the warrant application to determine its sufficiency.

---

[6] Judge Evans colorfully glosses the idiom "cat's paw" in *Staub v. Proctor Hospital*, ___ F.3d ____, __ WL ___, Case Nos. 08-1316, 225 & 2402 (7th Cir. March 25, 2009).

As both parties note in their briefs, I did not allow either side fully to develop/dispute the facts underlying the probable cause determination, taking the too-narrow view that the government's burden was limited to proving that Officer Halvorsen had acted in good faith. Therefore, the record does not contain all of the information that Sgt. Tilley had at his disposal and intended to include in his search warrant application. As explained in the next paragraph, this probably doesn't matter because the information in the record is sufficient to establish a reasonable factual basis for the police to believe there was probable cause to support the warrant. However, if the government is risk averse, then during the § 636(b) objection period it should submit to the court a specific proffer of the other facts that the police actually were going to use to establish probable cause. To be fair to Newman, the government should serve any proffer ASAP so that Newman can, if he wishes, include in his objections any challenge to the sufficiency of this evidence.

As noted in the fact section, two informants whose reliability is not in the record told the police that they had bought drugs from a man at 407 Bluff Street. Their description of this man matched Newman. They said this man drove a blue moped. One of the informants had made a controlled buy of drugs from Newman at 407 Bluff Street within three days before July 3, 2008. This informant positively identified Newman from a photo as the seller. A criminal record check revealed that Newman had two prior convictions for drug offenses. This evidence, by itself, might be sufficient to establish probable cause. *See, e.g., United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006) ("Generally, a controlled buy, when executed properly, is a reliable indicator as to the presence of illegal drug activity"); *cf. United States v. Garcia*, 528 F.3d 481 (7th Cir. 2008) (warrant was supported by probable cause where informant reported from first hand

9

observation that within the past 72 hours he had been inside the target apartment, had observed a substance he believed to be cocaine in a plastic bag in the living room, he based his belief on the fact that he had been a cocaine seller in the past, and police established the reliability of this informant by reporting that his previous tips had led to the arrest of at least three other individuals). But the government does not need to establish actual probable cause; it only needs to establish the Sgt. Tilley had a reasonable basis to believe that this information provided probable cause to support his warrant request. A fresh controlled buy, a photo-ID, cross-corroboration from two informants, and Newman's record made it reasonable for Sgt. Tilley to believe that the court would grant his request for a warrant to search Apartment 3 at 407 Bluff Street.

Therefore, it was proper for Officer Halvorsen to tell Diaz that Sgt. Tilley was in the process of obtaining a warrant for her apartment. The fact that Diaz did not at the time–or even today–understand or agree with this course of action is irrelevant. Diaz was–and apparently still is–hung up on the fact that the moped was not actually stolen; therefore, as far as Diaz is concerned, the police should not even have been on her porch that night talking to her about searching her apartment. But the moped is just a MacGuffin, irrelevant to the drug investigation but by happenstance the catalyst for the showdown between the police, Newman and, his proxy, Diaz.

Newman questions why the police would press Diaz so hard for a consent search if they were so confident they could get a warrant. First, as discussed below, the police did not press Diaz as hard as Newman contends. Second, the police told Diaz why: everyone benefitted from consent because it was significantly quicker than a warrant. There they all stood on the front

porch at 8:00 p.m. on Thursday night, July 3, 2008, the eve of a three-day holiday weekend. Sgt. Tilley had to type a search warrant complaint, get an ADA on board, then find the duty judge for an after-hours review. Assuming that everything went smoothly, the search would not even have started before 11:00 p.m. or midnight. But if Diaz consented, then the search could begin at 8:15 p.m. and probably end before the 10:00 news started. It was not coercive for the police to point out the time benefit of a consent search versus execution of a search warrant.

Nor would it have been coercive for the police accurately to point out the possible spectrum of criminal culpability Diaz faced when choosing between a consent search or a warrant. Diaz testified at the evidentiary hearing that although Newman had lived in the apartment with her for a while, he had moved out in May, so that she was the only adult resident. In light of this, Diaz *did* have possible criminal exposure if the police found contraband more egregious than her marijuana and pipe. Even if the police were fairly certain that Newman was the dealer, depending on what the police found and where they found it, Diaz faced a realistic prospect of being charged with aiding and abetting or with maintaining a drug house.

This possibility crossed Diaz's mind that evening as well: she testified that she and the police all knew about Newman's prior drug convictions, and that she did not know what Newman and his friends were doing in her house while she was at work. Diaz most definitely did not want to be held responsible for other people's stuff. (*See* transcript, dkt. 20, at 59-60). On these facts, it would have been appropriate for the police to have offered Diaz a trade: you give us consent to search so we can get this over and go home, we give you street immunity for anything we might find in your apartment. If Diaz would let them in the door, then they would deem her responsible only for her own marijuana and leave it at that. Diaz obviously was–and

11

still is–upset that the police put her on the spot like that, but they did not have to offer her a choice at all. And "an offer that makes the recipient better off cannot be condemned as coercive." *United States v. Miller*, 450 F.3d 270, 273 (7th Cir. 2006).

In *Miller*, the police found drugs and illegal firearms in the house defendant shared with his girlfriend and their child, which gave the police probable cause to arrest them both which in turn would force the child into foster care. The police offered defendant a choice: if he cooperated, then they would not arrest him or his girlfriend. *Id.* at 272. The court found that this was not coercive:

> Clear articulation of the options makes a choice better informed and thus more rather than less voluntary. . . . Suspects are not entitled to full information, but can't complain when they get it and learn that some of the options are unpalatable. . . . An objectively unwarranted threat to arrest or hold a suspect's paramour . . . without probable cause could be the sort of overbearing conduct that society discourages by excluding the resultant statements. . . . But a factually accurate statement that the police will act on probable cause to arrest a third party unless the suspect cooperates differs from taking hostages.

*Miller,* 450 F.3d at 272.

In Newman's case, the parley occurred between the police and the third party, but the principle of *Miller* still applies. Therefore, it was not improper for the police to advise Diaz that if she made them go to the trouble of obtaining a search warrant, then they also would go to the trouble of exploring and pursuing additional charges against her, while if she was agreeable to a consent search, then they were agreeable to limiting her exposure to a civil citation.

What's left is Diaz's overarching claim that the police overbore her will by their heavy-handed tactics during this ten minute encounter. Undoubtedly these ten minutes were tense for

N/A
N/A

Diaz and for Alicia Berger. But the *gestalt* of the situation did not rise to the level of constitutional coercion. Diaz's entire interaction with the police, from their first approach until she signed the consent form, was only ten minutes long. Part of the time was spent with Diaz questioning why Newman had been arrested when the moped was not really stolen. Part of the time was spent waiting for Sgt. Tilley to arrive with a written consent form after Diaz had consented. *Cf. United States v. Ross*, 510 F.3d 702, 710 (7th Cir. 2007) (defendant cannot argue that he was worn down before he confessed where confession came 10 to 15 minutes after start of interview). The encounter took place in public, on Diaz's front porch, before dark. There were two police and two civilians present. There is no indication that Diaz felt that she was in custody, and Berger's implication that she was detained seems to arise later, during the search that followed Diaz's consent.[7]

Contrary to Diaz's claims at the evidentiary hearing, I conclude that she did not explicitly refuse consent three times and then relented only because the police would not take no for an answer. Instead, Diaz engaged in a dialogue with the police, expressed concerns about her personal criminal exposure for her marijuana, received in response a choice between two unpalatable but genuine options, then consented to the search. Before the police entered the apartment they confirmed Diaz's consent with a written form, which she read before signing. As discussed above, the police pushed hard, but they did not cross the constitutional line.

---

[7] Diaz makes it a point to note that Berger testified that the police wouldn't even let her leave to go to the bathroom, forcing her to urinate outside. *See* transcript, dkt. 20, at 81. This must have occurred after Diaz had consented and the search had begun, because Berger does not indicate that she left the porch during the initial ten minute encounter and Berger reports being left holding the dog down in the landing during the search, *id*. at 80. So, although there's probably more to this embarrassing incident than what made it into the record, it is irrelevant to the voluntariness challenge.

Obviously and understandably, Diaz was upset at the time, but the police did not overbear her will.

Finally Newman's motion to suppress his post-arrest statements is tied to his claim that these statements were derived from an illegal search. *See United States v. Budd*, 549 F.3d 1140, 1144 (7th Cir. 2008). Because the search was legal, Newman's statements should not be suppressed.

## RECOMMENDATION

Pursuant to 42 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that this court deny in all respects defendant Ronnie Newman's motion to suppress evidence.

Entered this 3rd day of April, 2009.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Post Office Box 591
Madison, Wisconsin  53701

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

April 3, 2009

Meredith P. Duchemin
Assistant U.S. Attorney
P.O. Box 1585
Madison, WI 53701-1585

Kelly Welsh
Federal Defender Services of Wisconsin, Inc.
222 West Washington Avenue, Ste. 300
Madison, WI 53703

     Re:   United States v. Ronnie Newman
           Case No. 09-cr-04-bbc

Dear Counsel:

     The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

     The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

     In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before April 13, 2009, by filing a memorandum with the court with a copy to opposing counsel.

     If no memorandum is received by April 13, 2009, the court will proceed to consider the magistrate judge's Report and Recommendation.

                        Sincerely,

                        /s/

                        Connie A. Korth
                        Secretary to Magistrate Judge Crocker

Enclosures
cc:    Honorable Barbara B. Crabb, District Judge

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

(1) injunctive relief;

(2) judgment on the pleadings;

(3) summary judgment;

(4) to dismiss or quash an indictment or information;

(5) to suppress evidence in a criminal case;

(6) to dismiss or to permit maintenance of a class action;

(7) to dismiss for failure to state a claim upon which relief can be granted;

(8) to dismiss actions involuntarily; and

(9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation. Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth with particularity the bases for these objections. An objecting party shall serve and file a copy of the transcript of those

portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection. Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects. The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection. The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions. The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.** *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).